**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

OMAR OCASIO,

                                        Plaintiff,

           v.                                                                 No. 08-CV-51
                                                                                (GLS/DRH)

F. DELUKE, C.O., Great Meadow Correctional
Facility; P. VanGUILDER, Deputy of Security,
Great Meadow Correctional Facility; RICHARD
ROY, Inspector General; D. BEEBE, C.O.; S.
HAMEL, C.O.; T. LESPIER, Sgt.; C. MURRAY,
Sgt.; R. ARMSTRONG, Lt.; S. ROWE,
Captain; JULIE DANIELS, Inmate Grievance
Coordinator; M. HARRIS, Nurse; RICHARD A.
DUNNING, as Administrator of the Estate of
Elaine Dunning; GREAT MEADOW
CORRECTIONAL FACILITY, Medical
Grievance Department; LUCIEN LeCLAIRE,
JR.; EDWARD McSWEENY; and DONALD
SELSKY,

                                        Defendants.
_____

**APPEARANCES:**                              **OF COUNSEL:**

OMAR OCASIO
Plaintiff Pro Se
2405 First Avenue
Apartment #5B
New York, New York 10035

HON. ANDREW M. CUOMO                    JAMES SEAMAN, ESQ.
Attorney General for the                       ADAM SILVERMAN, ESQ.
    State of New York                          Assistant Attorneys General
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

Plaintiff pro se Omar Ocasio ("Ocasio"), formerly an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, fifteen DOCS employees and a facility grievance department, violated his constitutional rights under the First, Eighth, and Fourteenth Amendments.  Compl. (Dkt. No. 1).  Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt. No. 129.  Ocasio opposes the motion.  Dkt. Nos. 135, 148.  For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

The facts are related herein in the light most favorable to Ocasio as the non-moving party.  See subsection II(A) infra.  The events in question occurred during Ocasio's incarceration at Great Meadow Correctional Facility ("GMCF").

### A. Excessive Force

On January 13, 2006, Ocasio was involved in an incident with defendants Deluke, Beebe, and Maguire.  Dkt. No. 128-8 at 7.  Deluke and Beebe escorted Ocasio from the shower to his cell.[2]  Dkt. No. 128-8 at 7; Ocasio Dep. 1 (Dkt. No. 129-3, Ex. A) at 24.[3]

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[2] When traveling throughout the correctional facility, inmates are handcuffed behind their backs pursuant to DOCS policy.  Murray Decl. (Dkt. No. 129-8 at 1-5) ¶ 6.  The inmate stands in front of his cell gate within reach of a slot in the cell door.  Id.  When the

When he entered his cell, Ocasio was instructed to place his hands through a slot in the cell door so that the restraints could be removed.[4]  Dkt. No. 128-8 at 7; Ocasio Dep. 1 at 26-27. As Deluke was passing the retention strap[5] through the feed-up slot to Beebe, Ocasio allegedly turned his body attempting to maintain control of the restraints.  Dkt. No. 128-8 at 7.  Murray heard Beebe and Deluke "give Ocasio several orders to release the feed-up port and place his hands through the port so the restraints could be removed.  Ocasio failed to comply with their orders . . . . " Dkt. No. 129-8 at 12; see also Murray Decl. (Dkt. No. 129-8 at 1-5) ¶ 14.  Ocasio disputes this fact, contending that he was completely compliant.

---

slot is opened, the inmate is ordered to place his hands through the slot and the restraints are applied.  Id.  The inmate then steps forward into the cell, withdrawing his hands from the slot, and the cell gate is opened so that the inmate may back into the hallway.  Id.

[3] Ocasio filed another lawsuit in the Northern District naming certain defendants named herein, concerning an excessive use of force and subsequent deliberate indifference to medical treatment regarding an altercation on January 13, 2006 with Deluke and Beebe.  See Ocasio v. Greene, No. 08-CV-18 (TJM).  The defendants' motion for summary judgment in that case was recently granted for failure to exhaust administrative remedies and a meritless Eighth Amendment claim.  Id., Dkt. No. 90. Citations to Ocasio's first deposition are those responses provided in connection with the Greene case.  In the deposition, Ocasio stated that the difference between the two claims was that the present action is "a retaliatory complaint solely . . . being denied [his Fourteenth] and First Amendment rights . . . ." Ocasio Dep. 2 (Dkt. No. 129-3, Ex. B) at 9. However, the bulk of the complaint and related documentation relates to the alleged use of force, and Ocasio still contends that is an issue in the present complaint.  Ocasio Dep. 2 at 10.

[4] The process for removing restraints once an inmate is returned to his cell is essentially the reverse of that discussed above in note 3.  Murray Decl.  ¶ 7.

[5] A retention strap is a 3' piece of nylon knotted in the center piece of the handcuffs and used to ensure that the officer maintains control of the restraints during the application and removal of the handcuffs and also prevents inmates from retaining the handcuffs and using them as weapons or tools to disable the cell gates.  Murray Decl. ¶¶ 8-12.  Ocasio is unsure whether he was restrained with a retention strap on the date in question; however, the video clearly displays an officer walking away from the cell after the alleged use of force with a strap in his hands.

Ocasio Dep. 1 at 28-29, 68-69 (reporting that both defendants repeatedly told him to "Stop resisting" but that Ocasio maintains that he was complying with the officers' requests). Beebe maintained control of Ocasio's right hand and Deluke maintained control of the left. Dkt. No. 129-8 at 7, 12, 14-15; Ocasio Dep. 1 at 27-32, 71.  According to Ocasio, he faced forward upon arriving at his cellas required.  Ocasio Dep. 1 at 33, 65, 71-75. Non-party Maguire ultimately removed the restraints, Beebe and Deluke released Ocasio's hands, Ocasio remained in his cell, and the feed-up slot was closed without further incident.  Dkt. No. 128-8 at 7, 13-15; Dkt. No. 148 at 22.  Video of the event, while poor in audio quality, indicates that the entire event transpired in approximately three and a half minutes.  Video. As a result of the incident, Ocasio was issued a misbehavior report for failing to follow a direct order and exhibiting violent conduct.  Dkt. No. 129-8 at 23.

On January 13, 2006, defendant Harris was called to Ocasio's cell at approximately 9:30 a.m. to complete a use of force medical exam.  Harris Decl. (Dkt. No. 129-6 at 1-5) ¶ 8; Dkt. No. 129-6 at 12; Dkt. No. 148 at 65.  Harris asserts that Ocasio refused the examination.  Harris Decl.  ¶ 8; Dkt. No. 129-6 at 12; Dkt. No. 129-8 at 8, 10, 12; Dkt. No. 148 at 22, 34; Ocasio Dep. 1 at 114, 116-19.  Ocasio informed Harris that she  was not allowed into Ocasio's cell, so Murray proposed that Ocasio "stick his] hand out the slot . . . ." for Harris to perform the medical evaluation . . . ."  Ocasio Dep. 2 at 94.  Ocasio agreed, but when he insisted that the examination be done professionally, Murray told Harris to to continue on her rounds.  Id. at 94-95.  Non-party Officer Little attempted to take pictures of Ocasio after the incident, but Ocasio refused to comply and turned off the light in his cell. Dkt. No. 129-8 at 12.

Ocasio denies ever receiving a medical examination and only receiving medical

attention after his fiancee called the IG's office with a complaint of excessive force after visiting Ocasio on January 15.  Ocasio Dep. 1 at 84, 116-19.  Ocasio claims that the medical staff still did not evaluate him until weeks later.  Id. at 85.  Ocasio claims that the immediate injuries included pain and significant bleeding and that his right arm and wrist had been twisted.  Id. at 34-37, 39-49, 77-80; Ocasio Dep. 2 at 12-13.

Later that day, defendant Dunning, a nurse, examined Ocasio and noted two complaints, a rash on his forehead and dental pain.  Harris Decl. ¶ 9; Dkt. No. 129-6 at 13. The following day, January 14, Ocasio offered no medical complaints.  Harris Decl. ¶ 10; Dkt. No. 129-6 at 13; Dkt. No. 148 at 23.  On both January 15 and 16, Ocasio complained of vague pain in his forearms, but examination showed no abrasions or swelling.  Harris Decl. ¶ 11; Dkt. No. 129-6 at 13-14; Dkt. No. 148 at 23, 64, 66.  Ocasio asserts that on January 15, his hand was swollen two to three times its normal size but that he continued to write dozens of grievances.  Ocasio Dep. 1 at 101; Ocasio Dep. 2 at 13-15.  Ocasio stated that his hand remained swollen and discolored for weeks.  Ocasio Dep. 2 at 15-16.

On January 17, 2006, Ocasio was examined by Nurse Lipka to whom he complained of dental pain and requested to see a dentist  and was then seen by Nurse Stevens to whom he reported left arm and right hand pain.[6]  Harris Decl.  ¶ 13; Dkt. No. 129-6 at 14; Dkt. No. 148 at 64.  Ocasio was escorted to Nurse Stevens by non-party Sergeant Hendry, who photographed Ocasio's injuries.  Dkt. No. 129-7 at 4; Dkt. No. 148 at 22.  Hendry "observed Ocasio dress himself in his cell prior to the escort.  Ocasio had no problem putting on his

---

[6] Contrary to the noted medical entries, Ocasio contends that he knew his hand was fractured immediately and continuously asked medical staff for assistance and diagnostic testing.  Ocasio Dep. 1 at 87-88.

jumpsuit, sneakers, or allowing us to place him in handcuffs and waist chain." Dkt. No. 129-7 at 4. Stevens' examination of Ocasio revealed puffiness and bruising on his right hand and two scratches on his left arm. Harris Decl. ¶ 13; Dkt. No. 129-6 at 14; Dkt. No. 129-8 at 9, 11; Dkt. No. 148 at 33. Stevens found no further injuries and that Ocasio displayed a full range of motion while dressing and undressing for the examination. Dkt. No. 129-8 at 9. Ocasio's subjective complaints included that "his hands were in terrible pain, his arm wouldn't move properly, and he couldn't make a fist with his right hand." Dkt. No. 129-7 at 4. According to Ocasio, Stevens failed both to palpate his hand during the examination, relying on her observations from afar, and record the severity of his injuries. Ocasio Dep. 1 at 110-11, 121, 126-30. According to Ocasio, despite the pain and swelling in his hand, he continued to write grievances to individuals and use his hands to eat, and he still experiences fatigue, pain, and tingling occasionally. Ocasio Dep. 1 at 131-32, 136-38.

Nurse Lipka saw Ocasio on rounds again on January 18, 19 and 20, and during that time Ocasio offered no complaints of pain in his arms or hands. Harris Decl. ¶ 14; Dkt. No. 129-6 at 15; Dkt. No. 148 at 63. On January 19, non-party Ortiz from the Inspector General's ("IG's") Office, received a complaint about the incident on January 13. Ortiz Decl. (Dkt. No. 129-9 at 1-2) ¶ 2. Ortiz conducted an investigation, which included an interview of Ocasio on February 7, 2006. Id. ¶ 4; see also Dkt. No. 148 at 20, 22 (copy of investigation request and report). Ocasio stated that the use of force constituted Deluke "putting a lot of pressure on [his] hands . . . " which caused Ocasio pain, until Maguire arrived and removed his handcuffs. Dkt. No. 129-9 at 4; Dkt. No. 148 at 22. Ocasio added that there was no medical evaluation completed because if things "were not going to be [done] as per [his] request, [he] refuse[d]. [He] wanted in detail [his] medical evaluation." Dkt. No. 129-9 at 5;

see also Dkt. No. 148 at 22, 27.

On January 23 and 24, 2006, Ocasio complained to Dunning about his right hand, requested an x-ray, and she scheduled a doctor's appointment for February 17, 2006. Harris Decl. ¶ 15; Dkt. No. 129-6 at 16; Dkt. No. 148 at 23, 62; Ocasio Dep. 2 at 102-05. On January 26, 2006, Ocasio complained to Lipka of right hand pain and numbness, though she observed no swelling or decreased range of motion.  Harris Decl. ¶ 16; Dkt. No. 129-6 at 17; Dkt. No. 148 at 61.  Lipka spoke with the physician's assistant about Ocasio's complaints and he agreed to see Ocasio.  Harris Decl. ¶ 16; Dkt. No. 129-6 at 17.  On January 27, 2006, Ocasio again saw Dunning and complained of right hand pain.  Harris Decl. ¶ 17; Dkt. No. 129-6 at 17; Dkt. No. 148 at 61.  Dunning told Ocasio that he was scheduled to see a physician on February 17, 2006 and noted that he did not appear to be in any distress.  Harris Decl. ¶ 17; Dkt. No. 129-6 at 17; Dkt. No. 148 at 61.

On January 28, 2006, the physician's assistant saw Ocasio and discussed only a restricted diet.  Harris Decl. ¶ 18; Dkt. No. 129-6 at 18.  Ocasio inquired about x-rays the following day and on February 1.  Dkt. No. 148 at 45-46.  On February 14, 2006, Ocasio complained of right hand pain to Nurse Nichols and requested an x-ray.  Harris Decl. ¶ 19; Dkt. No. 129-6 at 22; Dkt. No. 148 at 56.  On February 17, 2006, Ocasio saw a physician who ordered an x-ray of his right hand.  Harris Decl. ¶ 20; Dkt. No. 129-6 at 23; Dkt. No. 148 at 55.  On February 22, 2006, Ocasio requested another follow-up appointment on his right hand.  Dkt. No. 129-6 at 24, Dkt. No. 148 at 54; Ocasio Dep. 2 at 102.

On February 23, 2006, an x-ray was taken and revealed a fracture in Ocasio's third metacarpal which was healing.  Harris Decl. ¶ 21; Dkt. No. 1-1 at 6; Dkt. No. 129-6 at 25; Dkt. No. 148 at 53; Ocasio Dep. 1 at 110, 112.  Ocasio was instructed to rest and await

further instruction during his follow-up appointment in March.  Dkt. No. 129-6 at 25.  Ocasio

was not given a brace or any other assistive device.  Ocasio Dep. 2 at 105.  On February

28, 2006, Ocasio again inquired as to his hand and was again told to wait until his

appointment on March 14, 2006.  Dkt. No. 129-6 at 25.  Ocasio continued to ask for status

reports, but was always reminded to wait until his follow-up in March.  Dkt. No. 129-6 at 27-

28; Dkt. No. 148 at 50-51, 53.

Ocasio was again seen by medical staff on March 14, 2006.  Harris Decl. ¶ 22; Dkt. No.

129-6 at 32; Dkt. No. 148 at 48.  The examination "revealed slight tenderness over [the]

third metacarpal with no crepitus . . . [and] normal range of motion and normal grip strength.

The doctor concluded that the fracture was healing."  Harris Decl. ¶ 22; Dkt. No. 129-6 at

32; but see Ocasio Dep. 1 at 97 (claiming that he never had someone "look at [his] hand

specifically, see what was going, see[] the function of [his] hand, things like that . . . never

happened.").  Ocasio's hand function was determined to be normal.  Dkt. No. 129-6 at 32.

Ocasio testified that he presently continues to experience nerve damage in his hand from

the use of force.  Ocasio Dep. 1 at 102.  Ocasio continued to inquire about his x-ray results

from medical staff, though the x-rays had already been completed and read to Ocasio and

he was told that no further x-rays had been ordered or were needed.  Dkt. No. 129-6 at 34,

39-40, 45, 52.  Ocasio continued to see the medical department on an almost daily basis

throughout 2006.  Dkt. No. 129-6 at 34-71.

A disciplinary hearing on the misbehavior report issued to Ocasio was held in January

2006.  Dkt. No. 148 at 26.  On January 26, 2006, the hearing officer determined that certain

of Ocasio's witnesses were unnecessary because they lacked personal knowledge of the

events of the day in question.  Dkt. No. 148 at 24-25.  Ocasio claims he was denied a fair

and impartial hearing by defendant Armstrong because he was precluded from viewing and introducing the video as evidence.  Ocasio Dep. 2 at 81-86.  The hearing concluded on January 31, 2006 with a finding of guilt a sentence of nine months in the Special Housing Unit (SHU),[7] loss of privileges, twelve months loss of good time, and seven days of restricted diet.  Dkt. No. 148 at 26; Ocasio Dep. 1 at 174-75.

The disciplinary finding and sentence were later reversed.  Ocasio Dep. 1 at 173-74; Dkt. No. 129-3 at 306; Ocasio Dep. 2 at 126.  However, Ocasio was already confined to SHU for a period of years and his SHU confinement on this charge never commenced. Ocasio Dep. 1 at 176-77.  Ocasio did receive a restricted diet as a result of the hearing.  Id. at 181.  While Ocasio was receiving this diet, defendant Hamel prevented medical staff from evaluating Ocacio to ensure that he remained healthy on the restricted diet.  Ocasio Dep. 2 at 74, 78-79.

## B. Grievances

DOCS maintained an Inmate Grievance Program (IGP) for inmates to seek redress over issues of their confinement.  "The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review

---

[7]SHUs exist in all maximum and certain medium security facilities.  The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ."  N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b).  Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required.  Id. at pt. 301.

Committee] ... within four working days of receipt of the superintendent's written response."
Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

"DOCS Directive #4040 requires that grievance files and logs be maintained for at lest
the current year plus the previous four calendar years. . . The CORC computer database
contains records of all appeals received from the facility Inmate Grievance Program Offices
and which were heard and decided by CORC since 1990." Bellamy Decl. (Dkt. No. 129-5 at
1-2) ¶ 6. Ocasio was well aware of the grievance process, correctly reciting the steps
required to file a grievance and any appeals thereof. Ocasio Dep. 1 at 123, 143; Ocasio
Dep. 2 at 109.

Attached to Ocasio's complaint and filed with his response on this motion are multiple
letters filed to multiple individuals both inside and outside DOCS relating to various
complaints by Ocasio about his confinement prior to January 13, 2006. Dkt. No. 1-1 at 1-2,
4, 10-11, 13-14; Dkt. No. 1-2 at 1-5, 7, 17-19, 20-21; Dkt. No. 1-3 at 6-11, 13-14, 21; Dkt.
148 at 13. In a number of these letters, Ocasio was directed to follow the steps outlined in
the facility grievance procedures, or his complaints were forwarded to the Superintendent of
the facility in which he was housed, so that the grievance process would be initiated. Dkt.
No. 1-1 at 2, 7; Dkt. No. 1-2 at 3, 5. The responses also indicated that Ocasio's grievances
which were properly filed were being addressed accordingly and encouraged Ocasio to
continue following facility procedures for the most efficient and optimal resolution to his
complaints. Dkt. No. 1-2 at 5; Dkt. No. 1-3 at 7-8.

In January 2006, Ocasio filed five grievances. Dkt. No. 129-10 at 5. However, of the
five filed, none mentioned medical treatment or excessive force. Dkt. No. 129-10 at 5. In
March 2006, Ocasio filed a grievance concerning receiving x-rays for his right hand, but did

not ever file a grievance charging excessive force by officers.  White Decl. (Dkt. No. 129-10 at 1-2) ¶¶ 5-6, 8; Dkt. No. 129-10 at 5; Dkt. No. 129-10 at 7 (grievance seeking x-rays to be taken), 8 (response that x-rays were taken and the results were discussed in March).  In 2006, Ocasio only appealed two grievances to CORC which had been filed at GMCF.  Bellamy Decl.  ¶ 7.  Both grievances were filed on November 1, 2006 and pertained to over the counter medications and the grievance process respectively.  Id. ¶ 7.

The only grievances approaching he matters alleged in this case were one letter to DOCS Deputy Director Nadler and another to Superintendent Greene asserting that Ocasio had been assaulted on January 13 by two officers.[8]  Dkt. No. 1-2 at 22, 24.  The letters were difficult to read.  In the first, Ocasio asked Nadler to forward the letter to the forensic investigation unit, stating that there were witnesses to the assault and subsequent swnial of medical attention.  Id. at 22.  The second letter only identified Deluke as an assailant and that Deluke was being investigated by the DOCS Inspector General.  Id. at 24.  However, this letter never sought to lodge a formal complaint or initiate the grievance process.  As the months passed, responses to Ocasio re-emphasized that Ocasio's compliance with the grievance system was imperative and detailed the responses to Ocasio's previously filed grievances.  Dkt. No. 1-1 at 3; Dkt. No. 1-2 at 10, 16; Dkt. No. 148 at 30.  Additionally, Ocasio continually filed letters to various departments and individuals immediately after the alleged use of force.  See Dkt. No. 1-1 at 7-9, 12; 1-2 at 22-24 (six letters written by Ocasio

---

[8] A third letter apparently addressed to VanGuilder stated Ocasio's intent to have criminal charges filed against Deluke and Beebe for interfering with his religious meals and failing to provide him with the SHU videotape of the use of force incident on January 13.  Dkt. No. 1-2 at 23.  The remaining correspondence provided by Ocasio dated in 2007, solely pertains to his requests for documents, the appropriate procedure for receiving such documents, and the cost for the documents.  Dkt. No. 1-3 at 12, 16-23.

in January 2006); Dkt. No. 1-1 at 5, 15; Dkt. No. 1-3 at 1-5 (four letters written by Ocasio in February 2006) .

Ocasio testified that he grieved the issues surrounding January 13, 2006 multiple times. Ocasio stated that he filed ten to fifteen complaints per week regarding the excessive use of force, and that he received no responses, so "[n]othing was being exhausted."  Ocasio Dep. 1 at 122; compare Ocasio Dep. 2 at 121-22 (stating that in the six months subsequent to the alleged incident, he filed 200-25 grievances, averaging approximately fifty pages per week throughout these first few month).  These complaints were filed with different agencies and organizations.  Ocasio Dep. 1 at 123-24.  Ocasio stated that he filed grievances "at least four or five times" regarding the lack of medical treatment that was afforded to him after the use of force incident.  Id. at 120.  Regarding the events of January 13th as a whole, Ocasio could not exhaust his claims "on record because [defendants] did [not] let . . . specific grievance[s] . . . lead to specifically an exhaustive remedy process . . . ."  Id. at 122-23; see also Ocasio Dep. 1 at 139-45, 160-62.  Ocasio contended that defendants frustrated his right to participate in the grievance process, but failed to proffer any specific examples of grievances filed or the failure of DOCS to review them in the appeals process.  Ocasio Dep. 1 at 125-26.  During Ocasio's second deposition, he identified Murray as the individual who frustrated his attempt to file grievances by informed Ocasio that "as far as what took place on the 13th, [he] will never be able to exhaust that through the grievance officials while [Murray was t]here."  Ocasio Dep. 2 at 39.

Ocasio also stated that while his grievances were being accepted and presumably mailed, he was also sending copies to Albany to ensure that his complaints were being addressed, but he still failed to receive any responses.  Ocasio Dep. 1 at 149-57.  Other

grievances that he filed were completely exhausted despite Murray's alleged threats.

Ocasio Dep. 1 at 157-58; Ocasio Dep. 2 at 40.  Ocasio also blamed the limited number of

grievances actually taken to completion on defendant Daniel because there were only a

portion of those grievances which "she felt . . . [were] actually exhaustive through . . . the

grievance mechanism within the CORC office in Albany . . . ."  Ocasio Dep. 2 at 53;

see also Ocasio Dep. 2 at 55-60.

Ocasio also contends that multiple defendants were included in the present action for

failing to respond to complaints which Ocasio had sent them.  This included VanGuilder's

failure to respond to Ocasio's letters (Ocasio Dep. 2 at 61-66, 123); Roy's failure to respond

or initiate investigations into Ocasio's complaints (id. at 72-73), Rowe's lack of response to

Ocasio's complaints (id. at 88); and Leclaire, Selsky, and McSweeny's proclivity to forward

the grievances and complaints Ocasio sent to them back to GMCF without conducting their

own investigation (id. at 107-09, 113-14, 117-19).


**C. Retaliation**

Ocasio had previously complained about Deluke and Beebe, resulting in investigations

against both of them.  Ocasio Dep. 1 at 49-56, 62.  Ocasio had Deluke investigated "at least

two or three times . . . prior to [him] being assaulted . . . [for] harassment . . . [and] physical

infliction."  Ocasio Dep. 2 at 19.  Deluke was aware of these complaints.  Ocasio Dep. 1 at

56-61; Ocasio Dep. 2 at 25-28.  Deluke informed Ocasio that he knew the investigator with

whom Ocasio had lodged his complaints and that Deluke had influence over him.  Ocasio

Dep. 1 at 59; Ocasio Dep. 2 at 26-27.  This incident occurred approximately four to six

months before the incident forming the basis of the present complaint.  Ocasio Dep. 1 at

13

59-61.

Ocasio also claimed that the video cameras in SHU were not working properly, another element of the alleged retaliation.  Ocasio Dep. 2 at 30, 81-82.  This claim was reiterated with regard to defendant Armstrong for failing to maintain and provide such tapes to inmates during their disciplinary hearings.  Id. at 84-85.  Additionally, Ocasio claims he was placed on full restraints in retaliation for the events of January 13, 2006.  Id. at 32-33.  Beebe would place the full restraints on very tightly when he escorted Ocasio throughout the facility subsequent to January 13.  Id. at 35.  Furthermore, Ocasio claims that all of the documents produced in the course of reporting the use of force incident, including the summary provided to Armstrong by Murray, was a falsified report meant to conceal the real events that transpired that day.  Id. at 46-51.

Ocasio also contends that his filings of grievances against Hamel and Lespier ended in retaliatory acts.  Ocasio Dep. 2 at 76-80.  Ocasio stated that due to the multiple investigations he requested against both defendants, they issued approximately twenty disciplinary charges which caused the amount of time Ocasio was required to remain in SHU to be extended.  Id. at 76-80.


## III.  Discussion

Ocasio alleges that he was subject to excessive force and to deliberately indifferent medical treatment and that defendants retaliated against him for filing grievances.  Liberally construing the complaint, it also appears that Ocasio alleges a due process violation due to a biased disciplinary hearing and disposition resulting from the misbehavior report lodged against him after the use of force.  Defendants contend that (1) several defendants should

14

be dismissed for lack of personal involvement, (2) Ocasio has failed to exhaust his administrative remedies with regard to his Eighth Amendment claims, (3) Ocasio's claims are meritless, (4) the Eleventh Amendment bars all claims against Great Meadow, and (5) defendants are entitled to qualified immunity.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant,

15

a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247-48.

## B. Failure to Exhaust

Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases. Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 83 (2006).  This exhaustion requirement applies to all prison condition claims.  Porter, 534 U.S. at 532.  "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement."  Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999). The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate.  Nussle, 534 U.S. at 524.

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply."  Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citing Giano v. Goord, 380 F.3d 670, 677 (2d Cir. 2004)).  Exhaustion for an inmate in DOCS custody is generally achieved through the Inmate Grievance Program

(IGP).  See N.Y. Comp. Codes R. & Regs. tit. 7, § 701.1, et seq..  However, when inmates fail to follow the IGP, a court must conduct a three-part inquiry to determine if such failure is fatal to their claims.  A court must consider whether

> (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

Ruggiero, 467 F.3d at 175 (citing Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004)).

Administrative remedies are unavailable when there is no "possibility of [] relief for the action complained of."  Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir. 2004) (citing Booth v. Churner, 532 U.S. 731, 738 (2001)).  The test to determine the availability of an administrative remedy is an objective one asking whether "a similarly situated individual of ordinary firmness" would have deemed it accessible.  Id. at 688.

The record shows that Ocasio has failed to file any grievances, pursuant to facility policy, regarding his excessive force claims.  Dkt. No. 129-15 at 5.  Additionally, while Ocasio filed a grievance related to the medical care he received for his hand, he failed fully to exhaust this grievance by appealing it up through CORC.  White Decl. ¶¶ 5-6; Dkt No. 129-10 at 5, 7-8; Bellamy Decl.  ¶ 7.  It is also undisputed that Ocasio was well informed about the grievance process, understood how it worked, and effectively utilized it on multiple occasions both prior and subsequent to the incident on January 13.  See generally Ocasio Dep. 1 at 123, 143; Ocasio Dep. 2 at 109.

Ocasio contends that despite this knowledge, and despite the fact that he literally filed hundreds of complaints in the months following January 2006, the grievance process was

generally unavailable to him as he was frustrated by a single threat by Murray and Daniel's selective processing of his grievances.  Ocasio Dep. 1 at 120-26, 139-45, 160-62; Ocasio Dep. 2 at 121-22.  These claims are belied by Ocaiso's own actions.  Ocasio's testimony indicates that he continued to file dozens of letters of complaint immediately following the use of force and alleged impediments created by DOCS staff.  Ocasio Dep. 1 at 122; Ocasio Dep. 2 at 121-22.  Accordingly, even construing the facts in the light most favorable to Ocasio, administrative remedies remained available as he continued to file grievances with various individuals in spite of an alleged use of force and threats.

This conclusion is supported by Ocasio's provision to the Court of copies of ten letters that he wrote directly after the use of force and threat.  See Dkt. No. 1-1 at 7-9, 12; 1-2 at 22-24 (six letters written by Ocasio in January 2006); Dkt. No. 1-1 at 5, 15; Dkt. No. 1-3 at 1-5 (four letters written by Ocasio in February 2006).  It is, therefore, undisputed Ocasio continued to lodge numerous complaints, but chose not to fashion the complaints in the form of a facility grievance.  Moreover, any arguments that Ocasio's injuries prevented him from filing grievances is also contradicted by his testimony.  The record illustrates that, regardless of Ocasio's physical state, he was able to continue file complaints about his conditions of confinement.  Ocasio Dep. 1 at 122; Ocasio Dep. 2 at 121-22; Dkt. No. 1-1 at 5, 7-9, 12, 15; 1-2 at 22-24; Dkt. No. 1-3 at 1-5.

The record also establishes without contradiction that Ocasio was well aware of the grievance procedure, and remained engaged in it without pause, prior to and after January 13.  Docket No. 129-10 at 4-5 (recording two grievances filed on December 8, 2005, five grievances filed on January 9, 2006, and two grievances filed on March 8, 2006, one of which was the grievance regarding Ocasio's medical care).  Ocasio also pursued some

18

grievances through CORC to completion.  White Decl. ¶ 7.  It appears that, in this instance, Ocasio simply failed to participate and properly utilize the mandatory administrative system. This failure is fatal to Ocasio's claim.  See generally Ruggiero v. County of Orange, 467 F.3d 170, 177 (2d Cir. 2006) (explaining that where there are administrative remedies available, the inmate is "required to exhaust them.") (citations omitted).

Accordingly, defendant's motion should be granted on this ground.[9]


### C. Personal Involvement

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority. Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

---

[9] While not argued by defendants, the record also shows that Ocasio failed to exhaust his administrative remedies with respect to his retaliation claims.  Furthermore, liberally construing the complaint, Ocasio has also failed to exhaust any due process claims or Eighth Amendment claims regarding his placement on, or treatment during, his restricted diet.  Accordingly, defendants' motion should be granted for those claims for Ocasio's failure to exhaust those claims as well.

> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).


### 1. VanGuilder and Rowe

Ocasio's principle complaints against VanGuilder and Rowe were that they failed to respond to Ocasio's multiple letters of complaint.  Ocasio Dep. 2 at 61-66, 88, 123.  However, such contentions are insufficient to establish personal involvement.  See Bodie v. Morgenthau, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) (citations omitted) (finding personal involvement only where a supervisory official received, reviewed, and responded to a prisoner's complaint); Johnson v. Wright, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose respondeat superior liability.") (citations omitted).

Similarly, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement.  See, e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) (citing cases); Boddie v. Morgenthau, 342 F. Supp. 2d 193,  203 (S.D.N.Y. 2004).  The complaint also fails to establish any facts that defendants received or responded to complaints or letters.  Additionally, the record fails to

support any contentions that either defendant was involved with training the individuals involved in these alleged constitutional violations or that either was grossly negligent in performing his employment duties.

Accordingly, defendants' motion should be granted on this ground as to VanGuilder and Rowe.


## 2. Roy

To the extent that Ocasio claims Roy was personally involved as the DOCS Inspector General, such contentions are meritless because a position in a hierarchical chain of command, without more, is insufficient to establish personal involvement.  Wright, 21 F.3d at 501.  Moreover, for the reasons outlined above, Roy was not personally involved merely because Ocasio sent him multiple pieces of correspondence to which he did not reply. Similarly, there is no evidence that Roy received or responded to complaints or letters. Additionally, the record fails to support any contentions that Roy was involved with training the individuals involved in these alleged constitutional violations or that he was grossly negligent in performing his employment duties.  Lastly, Ocasio has no constitutional right to an investigation and, therefore, such contentions cannot serve as the basis for § 1983 relief.  See Carrasquillo v. City of New York., 324 F.Supp.2d 428, 438 (S.D.N .Y. 2004) (holding that prisoners have "no constitutional or federal right to an investigation into ... [an] accident, or to have his requests for an investigation answered").

Accordingly, defendants' motion should be granted on this ground as to Roy.

### 3. LeClaire, Selsky,[10] and McSweeny

To the extent that LeClaire, Selsky, or McSweeny are claimed to be personally involved because of their high ranking positions in DOCS, such contentions fail.   Wright, 21 F.3d at 501.  Moreover, for the reasons outlined above, defendants were not personally involved merely because Ocasio claims to have sent them multiple pieces of correspondence to which he did not reply.  The complaint fails to establish any facts that defendants received or responded to complaints or letters.  Additionally, the record fails to support any contentions that these defendants were involved with training the individuals involved in these alleged constitutional violations or that any was grossly negligent in performing his employment duties.  Furthermore, for the reasons outlined above, Ocasio has failed to state a claim when contending that these defendants failed to investigate his claims.

Lastly, to the extent Ocasio has argued that these defendants actions in referring these complaints to the appropriate correctional facility or Superintendents render them personally involved, such contentions are meritless as such delegation is appropriate.  See Bodie, 342 F. Supp. 2d 193, 203 (citations omitted) (finding personal involvement where supervisory official received, reviewed, and responded to an inmate's complaint); Garrido v. Coughlin, 716 F. Supp. 98, 100 (S.D.N.Y.1989) (holding that Commissioner of DOCS not personally liable for ignoring plaintiff's letter of protest and request for an investigation).

Accordingly, defendants' motion should be granted on this ground as to LeClair, Selsky,

---

[10] Ocasio has included correspondence, and his testimony indicates, that one of his complaints against Selsky dealt with the general quality and reliability of the videotapes produced by the SHU surveillance cameras.  There is no further evidence proffered by either party about these issues though, and it is undisputed that Ocasio received the SHU videotape from January 13 for use in the instant litigation.  Therefore, this matter will not be further addressed.

and McSweeny.

### 4. Hamel, Lapier, Armstrong, and  Daniel

With respect to each of these four defendants, Ocasio has offered evidence of their direct involvement in his contended constitutional violations.  Ocasio stated that Daniel chose to selectively process his grievances, rendering the process unavailable to him. Ocasio Dep. 2 at 53, 55-60.  Such contentions establish direct personal involvement in an alleged constitutional violation.  Liberally construing Ocasio's complaint, he alleges that Hamel and Lapier promoted his unconstitutional conditions of confinement by prohibiting medical staff from checking on him and ensuring that his restricted diet was not physically harming him.  Id. at 76-80.  Lastly, Ocasio testified as to Armstrong's bias during the disciplinary hearing.  Id. at 84-85.

Accordingly, defendants' motion on this ground as to Hamel, Lapier, Armstrong, and Daniel should be denied.

### D. Retaliation

Ocasio's complaint alleges that he was subjected to retaliation by Deluke, Beebe, Armstrong, and Murray.  To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996); see also Lipton v. County of Orange, 315 F. Supp. 2d 434, 447-48 (S.D.N.Y. 2004) (applying First Amendment retaliation factors to a

pretrial detainee complaint).  Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration.  Jackson v. Onondaga County, 549 F. Supp. 2d 204, 214-15 (N.D.N.Y. 2008).  Conclusory allegations alone are insufficient.  Id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued with full discovery.")).

In this case, Ocasio has failed to allege facts sufficient to support a retaliation claim. Ocasio claims that Deluke and Beebe subjected him to excessive force in retaliation for his filing grievances and having investigations commenced against them.  Ocasio Dep. 1 at 49-56, 62.  While filing grievances and lawsuits are actions protected by the First Amendment, Ocasio has failed to establish that the events of January 13th were precipitated by any specific grievance or investigation.  Furthermore, while Ocasio states that Deluke generally attempted to intimate him by telling him that Deluke knew investigators who would believe him over Ocasio, such conversations occurred four to six months prior to the alleged use of force.  Ocasio presumably continued to have interactions with both officers during the time he remained, and they continued to patrol, the SHU facility.  Therefore, with the passage of so many months Ocasio has failed to state how this continued to be a substantial factor which would motivate any adverse action against him.  Accordingly, the requisite "temporal proximity between the [adverse action] . . . and the alleged retaliation . . . ." does not  to exist.  Bennett v. Goord, 343 F.3d 133, 138 (2d Cir. 2003) (citations omitted).  Moreover, the claims are generally conclusory and unsupported and, thus, must be dismissed. Jackson, 713 at 214.

Ocasio also contends that, after the January 13th, Beebe continually placed his

24

restraints on him too tightly in retaliation for the use of force. Ocasio Dep. 2 at 35. Ocasio's

actions in response to corrections officers directing him into his cell, whether compliant or

not, are not the type of activity protected by the constitution. Thus, even regarding Ocasio's

contentions as true, such allegations cannot form the basis of a retaliation claim.

Ocasio further alleges that Armstrong and Murray retaliated against him by falsifying

summaries from the use of force reports and prohibiting clear SHU surveillance tapes from

being available for use in the disciplinary hearing. Ocasio has failed to state what

constitutionally protected activity he engaged in which formed the basis of this claim.

Presumably, he alleges that his numerous complaints and grievances were the source of

this alleged adverse treatment. However, such claims lack specificity and are conclusory

and unsupported. Thus, they are insufficient to withstand a motion for summary judgment.

Jackson, 713 at 214.

 Accordingly, defendants' motion should be granted as to these claims.


### E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual

punishment." U.S. Const. amend. VIII.


### 1. Medical Care

This prohibition extends to the provision of medical care. Hathaway v. Coughlin, 37

F.3d 63, 66 (2d Cir. 1994). The test for a § 1983 claim is twofold. First, the prisoner must

show that the condition to which he was exposed was sufficiently serious. Farmer v.

25

Brennan, 511 U.S. 825, 834 (1994).  Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  Id.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at 844.

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting Hudson v. McMillian, 503 U.S. 1,9 (1992)).  Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain."  Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing Chance, 143 F.3d 698, 702 (2d Cir. 1998)).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs."  Chance, 143 F.3d at 702.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate.  Chance, 143 F.3d at 703.  Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms

of treatment, or the need for specialists . . . are not adequate grounds for a section 1983 claim." Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).

In this case, Ocasio has failed to establish a serious medical need. A fractured metacarpal has previously been found insufficient to establish the objective prong of the Eighth Amendment analysis. Ruiz v. Homerighouse, No. 01-CV-266E(SR), 2003 WL 21382896, at *3 (W.D.N.Y. Feb. 13, 2003) (citations omitted). Such a finding is also consistent with, findings that a broken finger is insufficient to state a serious medical need. See Magee v. Childs, No. 94-CV-1089 (GLS/RFT), 2006 WL 681223, at *4 (N.D.N.Y. Feb. 27, 2006) (citing cases). Accordingly, Ocasio has failed to establish the objective prong of the Eighth Amendment assessment.

Moreover, even if a fractured metacarpal was a serious medical need, Harris and Dunning were not deliberately indifferent in treating it. Nurse Harris was initially called to Ocasio's cell after the use of force, but was ordered not to complete the medical examination because Ocasio failed to cooperate. Ocasio Dep. 2 at 94-95. Therefore, it was not Harris' decision to provide or deny treatment.

Moreover, the objective medical evidence in the health records supports a conclusion that Ocasio's injury was not serious and did not require any type of care. Despite Ocasio's claims of blood and gore, none of those things were noted in the ambulatory health record, viewed on the SHU videotape, or seen in subsequent photos taken a few days later. The medical records, based upon the accounts of various medical staff indicate that Ocasio

vaguely and inconsistently complained of pain and discomfort in his arms.  Harris Decl. ¶¶ 10-21; Dkt. No. 129-6 at 13-23.  Despite Ocasio's testimony about the pain he suffered, his later testimony indicated that he was fully satisfied with his medical treatment.  Ocasio Dep. 1 at 88-89, 110-11, 121, 126-38.  Furthermore, observations of Ocasio's ability to dress and undress himself days after the use of force also belie claims that medical staff were aware of and deliberately indifferent to his hand.  Dkt. No. 129-7 at 4; Dkt. No. 129-8 at 9.

Lastly, Dunning's interactions with Ocasio are far from evident of indifference or delay.  Ocasio indicated to Dunning that he had pain in his hand and requested an x-ray.  Dunning immediately scheduled Ocasio for a doctor's appointment.  Harris Decl. ¶ 15; Ocasio Dep. 2 at 102-05; Dkt. No. 129-6 at 16; Dkt. No. 148 at 23, 62.  A doctor's appointment was required to obtain a referral for diagnostic testing and, thus, Dunning immediately did as much as was in her power to provide Ocasio with a diagnosis and relief from his intermittent hand pain.  Additionally, from the time that Ocasio requested the x-ray until it was performed, approximately one month passed.  This does not constitute an inordinate amount of time for an injury that was not an apparent emergency as Ocasio testified he was still able to write and eat with his hand despite the pain he was feeling.

Accordingly, in the alternative, defendants' motion as to these claims should be granted on this ground.

### 2. Excessive Force

The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain."  Gregg v. Georgia, 428 U.S. 153, 173 (1976); Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000).  To bring a claim of excessive force

under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." Hudson, 503 U.S. at 9 (internal citations omitted); Blyden, 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation per se" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9); see also Wilkins v. Gaddy, ___ S. Ct. ___, 2010 WL 596513 (2010) ("The core judicial inquiry . . . was not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10 (citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" Sims, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Id. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Id. (quoting Hudson, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] . . . the need for the application of force; the

29

correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

While a broken metacarpal was not categorized as a serious injury above, a serious injury need not be established in order for an excessive force claim to survive summary judgment. Construing the facts in the light most favorable to Ocasio and that he was compliant with the officers' orders when his handcuffs were being removed, there was no reason to use any force during the removal. Thus crediting Ocasio's testimony, the actions of Deluke and Beebe in restraining Ocasio's shoulder, pulling the retention strap, and grasping his hands appear to have been solely for the purposes of harming Ocasio, which represents a malicious use of force constituting a per se Eighth Amendment violation. Blyden, 186 F.3d at 263; see also Wilkins, 2010 WL 596513 . Therefore, construing the facts in the light most favorable to Ocasio, he has established an Eighth Amendment claim against Deluke and Beebe for their malicious and intentional use of force during the removal of his restraints solely for the purpose of causing Ocasio harm.

Accordingly, defendants' motion as to Deluke and Beebe on this claim should be denied.

### 3. Conditions of Confinement

The Eighth Amendment prohibition against cruel and unusual punishment extends to prison conditions. Horne v. Coughlin, 155 F.3d 26, 31 (2d Cir. 1998). "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is

now settled that the treatment a prisoner receives in prison and the conditions under which

he is confined are subject to scrutiny under the Eighth Amendment." Farmer, 511 U.S. at

832. As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . .

and subjective test." Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted).

The objective prong can be satisfied by

> conditions of confinement . . . [which] in combination [constitute
> an Eighth Amendment violation] when each would not do so
> alone . . . [such as] when the conditions have a mutually
> enforcing effect that produces the deprivation of a single,
> identifiable human need such as food, warmth, or exercise – for
> example, a low cell temperature at night combined with a failure
> to issue blankets.

Davidson v. Murray, 371 F. Supp. 2d 361, 370 (W.D.N.Y. 2005) (citations omitted).

However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and

unusual punishment when no specific deprivation of a single human need exists." Id. (citing

Wilson v. Seiter, 501 U.S. 294, 304-05 (1991)).  The subjective prong requires "a prison

official [to] have a sufficiently culpable state of mind . . ., of deliberate indifference to inmate

health or safety" Farmer, 511 U.S. at 834 (citations omitted).  As to restrictive diets, no

constitutional violation will be found unless the "diet was nutritionally inadequate, posed an

imminent health risk, or physically injured [the inmate] . . . ." McEachin v. McGuinnis, 357

F.3d 197, 199-201 (2d Cir. 2004) (citations omitted).

In this case, even liberally construing the complaint and viewing the facts in the light

most favorable to Ocasio, he has failed to establish that placement on the restricted diet

was a violation of his Eighth Amendment.  Nothing in the record supports that the diet was

inadequate, posed a health risk, or injured Ocasio.  Thus, Ocasio has failed to satisfy the

objective prong of the analysis.  Furthermore, Ocasio's claims that Hamel and Lespier were

31

deliberately indifferent to his placement on the diet are also meritless.  First, as previously

stated, the objective prong has not been satisfied.  Second, even if the objective prong was

satisfied, the record belies Ocasio's claims of deliberate indifference.  The health records

provided are replete with medical entries of Ocasio continuing to see the medical staff

throughout 2006, multiple times per week.  Dkt. No. 129-6 at 34-71.  Thus, Ocasio's access

to medical staff was neither impeded nor delayed.

Accordingly, defendants' motion on this ground should be granted.


## F. Due Process

As a threshold matter, an inmate asserting a violation of his or her right to due process

must establish the existence of a protected interest in life, liberty, or property. See Perry v.

McDonald, 280 F.3d 159, 173 (2d Cir. 2001). To establish a protected liberty interest, a

prisoner must satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483-84

(1995). This standard requires a prisoner to establish that the deprivation was atypical and

significant in relation to ordinary prison life.  Id. at 484; Jenkins v. Haubert, 179 F.3d 19, 28

(2d Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate

has been disciplined with a segregated confinement alone is insufficient to establish an

atypical and significant deprivation.  The Second Circuit has articulated a two-part test

whereby the length of time a prisoner was placed in segregation as well as "the conditions

of the prisoner's segregated confinement relative to the conditions of the general prison

population" are to be considered.  Vasquez v. Coughlin, 2 F. Supp. 2d 255, 259

(N.D.N.Y.1998).  The Second Circuit has noted that where the period of segregated

confinement exceeds thirty days, "refined fact-finding" is required to resolve defendants' claims under Sandin.  Colon v. Howard, 215 F.3d 227, 230 (2d Cir. 2000).

As Ocasio was never confined in SHU on the disciplinary charge here prior to the reversal on administrative appeal, (Ocasio Dep. 1 at 176-77), there are no questions of fact which exist as to the liberty interest asserted by him.  Therefore, Ocasio's liberally construed claim that his procedural due process was violated during his disciplinary hearing is meritless as there has been no established accompanying liberty interest.  See generally Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir.1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)).

Accordingly, in the alternative, defendants' motion as to the due process claim should also be granted on this ground.[11]

### G. Eleventh Amendment

While Ocasio's response indicate that he is not suing GMCF in any capacity (Dkt. No. 148 at 3), the complaint names it as a defendant.  The Eleventh Amendment provides that

_____

[11] It is unclear from Ocasio's testimony whether or not he lost any good time credits as a result of his SHU disposition and subsequent reversal.  Ocasio Dep. 1 at 178-80.  It appears that the credit was restored.  However, even if it was not, this is the incorrect vehicle in which to request relief.  Any claims for the loss of "*already-earned* good time credit as a result of [the disciplinary disposition, should be addressed pursuant to a writ of habeas corpus as it i]s a prisoner's sole recourse in challenging the procedures used to deny him good-time credits."  Fifield v. Eaton, 669 F. Supp. 2d 294,  297 (W.D.N.Y. 2009) (citations omitted) (emphasis in original).

"[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State."  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment.  Halderman, 465 U.S. at 100.  Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. See Quern v. Jordan, 440 U.S. 332, 340-41 (1979).

Therefore, Ocasio's claims against GMCF, to the extent that any exist, are expressly barred by the Eleventh Amendment.  See Bryant v. New York State Dep't of Corr. Servs. Albany, 146 F. Supp. 2d 422, 425 (S.D.N.Y. 2001) ("State agencies, such as DOCS, serve as an arm of the state and are, similarly, entitled to Eleventh Amendment immunity.") (citations omitted).  Thus, the Eleventh Amendment bar applies and serves to prohibit Ocasio's claims against the correctional facility.

Accordingly, it is recommended in the alternative that defendants' motion on this ground be granted as to GMCF.


### H. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights . . . immunity might still be available as a bar to . . . suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights."   Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir.1991) (citations omitted).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry need not be reached as to all defendants except Deluke and Beebe because, as discussed supra, accepting all of Ocasio's allegations as true, he has not shown that any of these defendants violated his constitutional rights.

However, with respect to Ocasio's claims against Deluke and Beebe for their use or excessive force, the second prong of the analysis need be considered.  There is no question that it was well settled on January 7, 2008 that the Eighth Amendment required that inmates are to be provided "with . . . reasonable safety [as i]t is cruel and unusual punishment to hold convicted criminals in unsafe conditions," (Helling, 509 U.S. 33 (internal quotation marks and citations omitted)) whether that pertain to their medical care, conditions of confinement, or expectation for protection from corrections staff from

35

dangerous situations.  Thus, accepting Ocasio's allegations as true, qualified immunity

should be granted to Deluke and Beebe for their allege use of excessive force.

Accordingly, it is recommended in the alternative that defendants' motion on this ground

be denied as to Deluke and Beebe and granted as to all other defendants in all other

respects.


### III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for

summary judgment (Dkt. No. 129) be **GRANTED** as to all claims and all defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing

report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days

after being served with a copy of the . . . recommendation."  N.Y.N.D.L.R. 72.1(c) (citing 28

U.S.C. §636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN**

**FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984

F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  September 3, 2010
      Albany, New York

                                    David R. Homer
                                    U.S. Magistrate Judge